IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FINTECH FUND, FLP,                    §
                                      §
                 Plaintiff,           §
                                      §
v.                                    §    CIVIL ACTION NO. H-18-1125
                                      §
RALPH HORNE,                          §
                                      §
                 Defendant.           §

## MEMORANDUM OPINION AND ORDER

Plaintiff, Fintech Fund, FLP ("Fintech," "FTF," or "Plaintiff"), filed this action on April 10, 2018, against defendant, Ralph Horne ("Horne" or "Defendant"), asserting claims for violations of the Defend Trade Secrets Act, 18 U.S.C. § 1839 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq.[1] Pending before the court is Defendant Ralph Horne's 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction and Subject Thereto, 12(b)(1) and 12(b)(3) Motion to Dismiss for Lack of Subject Matter Jurisdiction and Improper Venue ("Defendant's Motion to Dismiss") (Docket Entry No. 18). For the reasons stated below, the court concludes that the Defendant's Motion to Dismiss should be granted.

## I. Background

Marcus Andrade is the founder of several technology companies in the biometric, data cross sharing, blockchain, and digital

---

[1] Original Complaint and Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction ("Complaint"), Docket Entry No. 1.

currency market[2] and Plaintiff is a financial technology company. Andrade is a limited partner of Plaintiff and is responsible for its management.[3] One of Andrade's companies licensed Plaintiff to enter into sublicenses for use of the technology. Plaintiff licensed its technology to its affiliate, CrossVerify Limited ("CrossVerify"), a United Kingdom ("UK") company of which Plaintiff owns the controlling shares.[4] CrossVerify is a biometric authentication company that uses blockchain technology to create an authentication utility that complies with anti-money laundering and know-your-customer regulations across industries.[5] Defendant Ralph Horne is a citizen of the UK who works and lives in the UK.[6] He became CrossVerify's Chief Executive Officer in May of 2017.[7] Defendant signed a Non-Disclosure, Confidentiality, Inventions, and

---

[2]Declaration of Marcus Andrade in Support of Plaintiff Fintech Fund, FLP's Motion for Expedited Discovery and Extension of Time ("Second Andrade Declaration"), Exhibit B to Plaintiff Fintech Fund, FLP's Response in Opposition to Defendant Ralph Horne's 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction and Subject Thereto, 12(b)(1) and 12(b)(3) for Lack of Subject Matter Jurisdiction and Improper Venue ("Plaintiff's Response"), Docket Entry No. 25-3, p. 2 ¶ 2.

[3]Declaration of Marcus Andrade in Support of Plaintiff Fintech Fund, FLP's Response in Opposition to Defendant Ralph Horne's Motion to Dismiss for Lack of Personal Jurisdiction ("Third Andrade Declaration"), Exhibit A to Plaintiff's Response, Docket Entry No. 25-2, p. 3 ¶ 5.

[4]Complaint, Docket Entry No. 1, p. 3 ¶¶ 9-10.

[5]Id. at 3 ¶ 10.

[6]Ralph Horne Declaration, Exhibit B to Defendant's Motion to Dismiss, Docket Entry No. 18-2, p. 2 ¶ 2.

[7]Complaint, Docket Entry No. 1, p. 4 ¶ 14.

Non-Solicitation Agreement ("Agreement"), which governs Defendant's responsibilities regarding Plaintiff's confidential information and trade secrets.[8] Plaintiff alleges that in November of 2017 Defendant deceived Plaintiff into giving Defendant access to Plaintiff's U.S. server by falsely telling Mr. Andrade that he needed the login credentials so that a vendor could perform a security audit.[9] Plaintiff alleges that in March of 2018 Defendant, or people acting in concert with him, gained access to Plaintiff's servers and downloaded confidential and proprietary information.[10] Plaintiff immediately terminated its license with CrossVerify, and Defendant resigned on April 9, 2018.[11]

Defendant moves to dismiss this action arguing that the court lacks personal jurisdiction over him and lacks subject matter jurisdiction because the parties' dispute is subject to mandatory arbitration in London, England.[12] On May 22, 2018, Fintech filed Plaintiff's Response. Defendant filed a reply and Plaintiff filed a surreply.[13]

---

[8]Agreement, Exhibit A to Complaint, Docket Entry No. 1-2.

[9]Complaint, Docket Entry No. 1, p. 7 ¶ 24; Third Andrade Declaration, Exhibit A to Plaintiff's Response, Docket Entry No. 25-2, p. 3 ¶ 6.

[10]Complaint, Docket Entry No. 1, p. 7 ¶¶ 24-25.

[11]Id. at 8 ¶¶ 26-27.

[12]Defendant's Motion to Dismiss, Docket Entry No. 18, pp. 2-3.

[13]See Defendant Ralph Horne's Reply in Support of Motion to Dismiss ("Defendant's Reply"), Docket Entry No. 31; Plaintiff (continued...)

## II. Motion to Dismiss for Lack of Personal Jurisdiction

Defendant argues that the court lacks personal jurisdiction over him.[14] Plaintiff responds that the court has personal jurisdiction over Defendant either under the traditional minimum contacts analysis or under Federal Rule of Civil Procedure 4(k)(2).[15]

### A. Standard of Review

Dismissal for lack of personal jurisdiction is governed by Federal Rule of Civil Procedure 12(b)(2). When a foreign defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff 'bears the burden of establishing the district court's jurisdiction over the defendant.'" Quick Technologies, Inc. v. Sage Group PLC, 313 F.3d 338, 343 (5th Cir. 2002), cert. denied, 124 S. Ct. 66 (2003) (quoting Mink v. AAAA Development LLC, 190 F.3d 333, 335 (5th Cir. 1999)). "When the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a *prima facie* case that personal

---

[13](...continued)
Fintech Fund, FLP's Surreply in Opposition to Defendant Ralph Horne's 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction and Subject Thereto, 12(b)(1) and 12(b)(3) for Lack of Subject Matter Jurisdiction and Improper Venue ("Plaintiff's Surreply"), Docket Entry No. 34.

[14]Defendant's Motion to Dismiss, Docket Entry No. 18, pp. 3-10.

[15]Plaintiff's Response, Docket Entry No. 25, pp. 17-19.

jurisdiction is proper.'" Id. (quoting Wilson v. Belin, 20 F.3d 644, 648 (5th Cir.), cert. denied, 115 S. Ct. 322 (1994)). "In making its determination, the district court may consider the contents of the record before the court at the time of the motion, including 'affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.'" Id. at 344 (quoting Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165 (5th Cir. 1985)). The court must accept as true the uncontroverted allegations in the plaintiff's Complaint and must resolve in favor of the plaintiff any factual conflicts. Guidry v. United States Tobacco Co., Inc., 188 F.3d 619, 625 (5th Cir. 1999). However, the court is not obligated to credit conclusory allegations, even if uncontroverted. Panda Brandywine Corp. v. Potomac Electric Power Co., 253 F.3d 865, 869 (5th Cir. 2001). "Absent any dispute as to the relevant facts, the issue of whether personal jurisdiction may be exercised over a nonresident defendant is a question of law to be determined . . . by th[e] Court." Ruston Gas Turbines, Inc. v. Donaldson Co., Inc., 9 F.3d 415, 418 (5th Cir. 1993).

**B.   Applicable Law**

1.   Personal Jurisdiction Under the 14th Amendment

A federal district court may exercise personal jurisdiction over a nonresident defendant if "(1) the forum state's long-arm statute confers personal jurisdiction over that defendant; and

(2) the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." <u>McFadin v. Gerber</u>, 587 F.3d 753, 759 (5th Cir. 2009), <u>cert. denied</u>, 131 S. Ct. 68 (2010). Since the Texas long-arm statute extends as far as constitutional due process allows, the court considers only the second step of the inquiry. <u>Id.</u>

Exercise of personal jurisdiction over a nonresident defendant comports with federal due process guarantees when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" <u>International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement</u>, 66 S. Ct. 154, 158 (1945) (quoting <u>Milliken v. Meyer</u>, 61 S. Ct. 339, 343 (1940)). Once a plaintiff satisfies these two requirements, a presumption arises that jurisdiction is reasonable, and the burden of proof and persuasion shifts to the defendant opposing jurisdiction to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." <u>Burger King Corp. v. Rudzewicz</u>, 105 S. Ct. 2174, 2185 (1985). "The 'minimum contacts' inquiry is fact intensive and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it 'reasonably anticipates being haled into court.'" <u>McFadin</u>, 587 F.3d at 759.

"There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to

general personal jurisdiction." <u>Lewis v. Fresne</u>, 252 F.3d 352, 358 (5th Cir. 2001). Because the parties agree that the court does not have general jurisdiction over Defendant, the relevant inquiry is whether the court can exercise specific jurisdiction over Defendant.[16]

A court may exercise specific jurisdiction when the alleged injuries arise from or are directly related to the nonresident defendant's contacts with the forum state. <u>Gundle Lining Construction Corp. v. Adams County Asphalt, Inc.</u>, 85 F.3d 201, 205 (5th Cir. 1996) (citing <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 104 S. Ct. 1868, 1872 n.8 (1984)); and <u>Quick Technologies</u>, 313 F.3d at 344. To determine whether specific jurisdiction exists, a court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice." <u>Gundle Lining</u>, 85 F.3d at 205. Even a single contact can support specific jurisdiction if the defendant "'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" <u>Burger King</u>, 105 S. Ct. at 2183. "The non-resident's 'purposeful availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state."

---

[16]<u>See</u> Plaintiff's Response, Docket Entry No. 25, p. 13 (". . . [O]nly specific jurisdiction is at issue here.").

-7-

Ruston Gas, 9 F.3d at 419 (citing World-Wide Volkswagen Corp. v. Woodson, 100 S. Ct. 559, 567 (1980)).

There are three parts to a purposeful availment inquiry. First, only the defendant's contacts with the forum are relevant, not the unilateral activity of the plaintiff or a third party. Sangha v. Navig8 ShipManagement Private Limited, 882 F.3d 96, 103 (5th Cir. 2018) (citing Walden v. Fiore, 134 S. Ct. 1115, 1122 (2014) ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State.")). Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. Id. (citing Walden, 134 at 1123). Finally, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. Burger King, 105 S. Ct. at 2183. A defendant may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there. Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 575 (Tex. 2007) (citing Burger King, 105 S. Ct. at 2181-85). Since specific jurisdiction is claim specific, "[a] plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim." Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274 (5th Cir. 2006).

2.  <u>Personal Jurisdiction Under Rule 4(k)(2)</u>

Rule 4(k)(2) states:

> ***Federal Claim Outside State-Court Jurisdiction.*** For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
>> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>>
>> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2). Where the defendant lacks "sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state[,]" Rule 4(k)(2) allows courts to consider whether the defendant's contacts with the United States as a whole satisfy due process standards. <u>World Tanker Carriers Corp. v. M/V Ya Mawlaya</u>, 99 F.3d 717, 720 (5th Cir. 1996); <u>see also</u> <u>Adams v. Unione Mediterranea Di Sicurta</u>, 364 F.3d 646, 651 (5th Cir. 2004) ("[S]o long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction."). "The due process required in federal cases governed by Rule 4(k)(2) is measured with reference to the Fifth Amendment, rather than the Fourteenth Amendment." <u>Submersible Systems, Inc. v. Perforadora Central, S.A. de C.V.</u>, 249 F.3d 413, 420 (5th Cir. 2001).[17] For purposes of Rule 4(k)(2) the

---

[17]"[W]hen applying Rule 4(k)(2), the Fifth Circuit has regularly adhered to the same legal standards developed in the Fourteenth Amendment context -- the now-familiar minimum contacts

(continued...)

United States is the applicable forum for the minimum contacts analysis under general and specific personal jurisdiction. See Patterson v. Aker Solutions Incorporated, 826 F.3d 231, 233-34 (5th Cir. 2016) (general); Quick Technologies, 313 F.3d at 344 (specific).

The plaintiff has the initial burden to "plead and prove the requisite contacts with the United States and plead Rule 4(k)(2)'s applicability . . . but it [has] no burden to negate jurisdiction in every state." Nagravision SA v. Gotech International Technology Limited, 882 F.3d 494, 499 (5th Cir. 2018). Once the plaintiff meets that burden through prima facie evidence, the burden shifts to the defendant to "affirmatively establish that the court lacked personal jurisdiction under 4(k)(2) because there was a state where its courts of general jurisdiction could properly exercise jurisdiction over it." Id. (citing Adams, 364 F.3d at 650). Because only specific jurisdiction applies in this case, Plaintiff must establish that its cause of action arises from or is directly related to Defendant's contacts with the United States, Helicopteros, 104 S. Ct. at 1872 n.8, and that Defendant purposefully availed itself of the privilege of conducting activities within the United States. Burger King, 105 S. Ct. at 2183.

---

[17](...continued)
analysis[.]" Patterson v. Blue Offshore BV, Civil Action No. 13-337, 2015 WL 4096581, at *9 (E.D. La. July 6, 2015) (affirmed by Patterson v. Aker Solutions Inc., 826 F.3d 231 (5th Cir. 2016)) (quotations and citations omitted).

## C.  Analysis

### 1.   14th Amendment Personal Jurisdiction

#### a.   Minimum Contacts

Defendant argues that the court does not have specific jurisdiction over him because he did not purposely direct any activities giving rise to this cause of action towards Texas, the Agreement reflects that he did not purposefully direct actions towards Texas, and he did not consent to jurisdiction in Texas for these claims.[18]  Defendant argues that although Plaintiff alleges that Defendant accessed Plaintiff's servers and improperly obtained Plaintiff's proprietary information, "[t]here is no allegation that any of theses alleged activities took place in Texas or that Fintech's server is even located in Texas."[19]  Plaintiff responds that Defendant "directed tortious communications and actions toward Texas, and those communications and actions give rise to Fintech's two federal statutory claims."[20]   In support, Plaintiff cites telephone calls and emails Defendant made to Andrade while Andrade was in Texas in which Defendant made fraudulent statements to obtain the login information to Plaintiff's server.[21]  Plaintiff

_____

[18]Defendant's Motion to Dismiss, Docket Entry No. 18, pp. 5-6; see also Ralph Horne Declaration, Exhibit B to Defendant's Motion to Dismiss, Docket Entry No. 18-2, p. 1 ¶ 3.

[19]Defendant's Motion to Dismiss, Docket Entry No. 18, p. 5.

[20]Plaintiff's Response, Docket Entry No. 25, p. 13.

[21]Id. at 15; Second Andrade Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 25-3, p. 4 ¶ 8.

argues that "Horne and his associates used those credentials in order to steal Fintech's Confidential Information and sabotage Fintech's software, causing Fintech substantial harm in Texas and elsewhere."[22]  Defendant argues that "there is no evidence that Horne _knew_ Andrade was in Texas at the time the phone calls were allegedly made and email allegedly sent."[23]

"A single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." Lewis, 252 F.3d at 358-59.  A single telephone call can be sufficient to confer personal jurisdiction over a defendant.  See Brown v. Flowers Industries, Inc., 688 F.2d 328, 332-33 (5th Cir. 1982).  "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment."  Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 213 (5th Cir 1999).

Although there is no evidence that Defendant knew that Andrade was in Texas when Defendant contacted him, Andrade is Plaintiff's representative.[24]  Defendant's telephone call was therefore directed toward Plaintiff, which is a limited partnership organized under the laws of the State of Texas with its principal place of business

---

[22]Defendant's Motion to Dismiss, Docket Entry No. 18, pp. 5-6.

[23]Id. at 8.

[24]Third Andrade Declaration, Exhibit A to Plaintiff's Response, Docket Entry No. 25-2, p. 3 ¶ 5 ("I am a limited partner of Fintech and, in that capacity, I am responsible for the management of Fintech.").

in Texas. At least one email that Defendant sent to Andrade regarding the allegedly false security audits was sent to Plaintiff's corporate email address at "fintechfund@crossverify. global."[25]    See Small Ventures USA, L.P. v. Rizvi Traverse Management, LLC, Civil Action No. H-11-3072, 2012 WL 4621130, at *5 (S.D. Tex. Oct. 2, 2012) (holding that the defendants had minimum contacts to Texas when the they "dialed the phone numbers of Plaintiff's representatives and directed emails to the email accounts of the Houston company. Defendants in these communications made their false representations . . ."). Moreover, Plaintiff produced evidence that Defendant knew that Plaintiff's offices are located in Texas,[26] and Defendant does not deny that he knew that Plaintiff's office is located in Texas.[27]

The content of the telephone and email communications directing Andrade to secure login credentials for Horne gives rise

---

[25]Email Re: Fwd: Security Audit, Exhibit F to Defendant's Reply, Docket Entry No. 31-6.

[26]Third Andrade Declaration, Exhibit A to Plaintiff's Response, Docket Entry No. 25-2, p. 3 ¶ 5 ("Ralph Horne has long been aware that Fintech operates its principal place of business from Texas. Mr. Horne and I have met in person in the Houston area on Fintech business, even before the events giving rise to this lawsuit."); Agreement, Exhibit A to Complaint, Docket Entry No. 1-2, ¶ 12(B) ("All disputes . . . against [Fintech] shall be finally adjudicated . . . in Houston, Texas, USA.").

[27]Defendant denies knowing Andrade's location at the time Defendant contacted him, but does not deny that he knew Plaintiff is a Texas company. See Defendant's Reply, Docket Entry No. 31, p. 9; Ralph Horne Declaration ("Horne Declaration"), Exhibit A to Defendant's Reply, Docket Entry No. 31-1, p. 5 ¶ 11.

to the underlying causes of action.[28]  Plaintiff alleges that Defendant violated the Defend Trade Secrets Act, 18 U.S.C. § 1839, when he "misappropriated [Plaintiff]'s trade secrets by acquiring them through improper means, as defined in 18 U.S.C. § 1839(6)."[29] The term "improper means" includes "misrepresentation." 18 U.S.C. § 1839(6).  Because Plaintiff alleges that Defendant secured the login credentials for Plaintiff's servers by making false statements in Defendant's telephone call and emails to Plaintiff, Plaintiff's claim for violation of the Defend Trade Secrets Act arises out of those communications.  Plaintiff's claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq., is based on "[Horne's] unauthorized access" of Plaintiff's computers with the intent to misappropriate trade secrets and confidential information.[30]  Because Defendant allegedly obtained the login information through fraudulent means, Defendant's access was not authorized.  The court concludes that Plaintiff has

_____

[28]Defendant admits that "[he] was provided with a username to the website server" but contends that he learned the "information was incorrect when [he] attempted to pass it on to another member of the CrossVerify staff."  Defendant also asserts that "[he] ha[s] never accessed (or directed anyone else to access) Fintech's server for any improper purpose."  See Horne Declaration, Exhibit A to Defendant's Reply, Docket Entry No. 31-1, p. 4 ¶ 8, p. 6 ¶ 13. Although Defendant disputes that he fraudulently requested login information and disputes that he accessed Plaintiff's servers, "[w]here facts are disputed, the plaintiff presenting a prima facie case is entitled to have the conflicts resolved in his favor." Wien Air Alaska, 195 F.3d at 211 (citations omitted).

[29]Complaint, Docket Entry No. 1, p. 9 ¶ 34.

[30]Id. at 9 ¶ 37.

established that Defendant knew that Plaintiff was located in Texas and that Defendant therefore would have known that its actions were purposefully directed toward Texas. Because Plaintiff has met its prima facie burden, the court has specific jurisdiction over Defendant. See Lewis, 252 F.3d at 358-59 (concluding that the content of the defendants' communications to the plaintiff shows purposeful availment when the defendants participated in a phone conversation "that was designed to convince [the plaintiff] to make the $650,000 loan").

> b. Exercise of Personal Jurisdiction Over the Defendant is Fair and Reasonable

In deciding whether it is fair and reasonable to require a nonresident defendant to litigate in Texas, a court must consider several factors: (1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in securing relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. Central Freight Lines Inc. v. APA Transport Corp., 322 F.3d 376, 384 (5th Cir. 2003) (citing Burger King, 105 S. Ct. at 2185, and Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, 107 S. Ct. 1026, 1033 (1987)).

> Once a plaintiff establishes minimum contacts between the defendant and the forum State, the burden of proof shifts to the defendant to show that the assertion of

jurisdiction is unfair and unreasonable.  <u>Wien Air</u>
<u>Alaska, Inc. v. Brandt</u>, 195 F.3d 208, 215 (5th Cir.
1999).  The defendant must make a "compelling case."

<u>Central Freight Lines</u>, 322 F.3d at 384 (quoting <u>Burger King</u>, 105

S. Ct. at 2185).

Defendant argues (1) that assertion of personal jurisdiction
over him would offend traditional notions of fair play and
substantial justice because he will incur significant costs in
defense of Plaintiff's claims, he will be burdened by travel from
London to Texas, he has no connection to Texas; (2) that the
judicial system's interest in resolving the dispute is not impacted
because arbitration offers an efficient resolution; and (3) that
the state's interest in furthering social policies does not
outweigh the burden on Defendant.[31]  While litigation in Texas may
be inconvenient for Defendant, Plaintiff could be equally
inconvenienced if required to litigate in the United Kingdom.
Defendant has previously traveled to Texas on business and has
offered no reason as to why litigating in Texas is especially
burdensome to him.[32]  Texas has an interest in this case because it
involves a Texas business whose trade secrets were allegedly
misappropriated, and the effects of Defendant's alleged actions
were felt in Texas.  Exercising personal jurisdiction over
Defendant in this case does not offend traditional notions of fair

---

[31]Defendant's Reply, Docket Entry No. 31, pp. 16-17.

[32]<u>See</u> Horne Declaration, Exhibit A to Defendant's Reply, Docket
Entry No. 31-1, p. 6 ¶ 14 ("I met Andrade in Texas to discuss
CrossVerify business on two occasions.").

-16-

play and substantial justice in light of Texas' interest in the case. Wien Air Alaska, 195 F.3d at 215 ("[O]nce minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant.").

### 2. Personal Jurisdiction Under Rule 4(k)(2)

Because Defendant has not conceded to jurisdiction in another state, and because there is no dispute that Plaintiff's claims arise under federal law, the court may have personal jurisdiction under Rule 4(k)(2) if Defendant has sufficient ties with the United States to satisfy due process. Adams, 364 F.3d at 651. The court uses the same legal standards developed in the Fourteenth Amendment context -- i.e., the minimum contacts analysis in the assertion of specific jurisdiction -- but the United States is the relevant forum. World Tanker Carriers Corp. v. M/V Ya Mawlaya, 99 F.3d 717, 723 (5th Cir. 1996).

Defendant argues that "Fintech has not identified the location of its servers other than to say they are in the United States."[33] Plaintiff responds that "though Horne may not have had reason to know which specific state Fintech's server was located in, he certainly knew or had reason [to] know this U.S. company's server was located in the United States."[34]

---

[33]Defendant's Reply, Docket Entry No. 31, p. 18.

[34]Plaintiff's Surreply, Docket Entry No. 34, p. 11.

Purposefully accessing or targeting a company's server that is located in the forum can satisfy minimum contacts. See Abatix Corp. v. Capra, Civil Action No. 2:07-541, 2008 WL 4427285, at *3 (E.D. Tex. Sept. 24, 2008) (holding that minimum contacts were met when "Defendants specifically directed their actions at Abatix's computer server, located within Collin County, Texas[,] in a manner that allegedly harmed Abatix in the State of Texas."); United States v. Batato, 833 F.3d 413, 425 (4th Cir. 2016) ("[T]he servers themselves held and allowed the transfer of the copyrighted material--they were the central conduit by which the conspiracy was conducted. The location of a substantial number of the servers in Virginia is clearly enough to demonstrate purposeful availment.").

As discussed in Section C(1)(a) above, Plaintiff has established that Defendant knew that Plaintiff was a United States company, and Defendant does not deny that it had knowledge that Plaintiff's office is located in Texas. Plaintiff alleges that "Horne or people acting in concert with him or under his direction logged into Fintech's US-based servers."[35] Plaintiff produced evidence that Andrade provided Defendant "login credentials for Fintech's US-based server."[36] Defendant denies that he unlawfully accessed the server, but acknowledged that he was "provided with a

---

[35]Complaint, Docket Entry No. 1, p. 7 ¶ 24 (emphasis added).

[36]Second Andrade Declaration, Exhibit B to Plaintiff's Response, Docket Entry No. 25-3, p. 4 ¶ 8 (emphasis added).

username to the website server."[37]  Because Plaintiff is entitled to have factual conflicts resolved in his favor, <u>Wien Air Alaska</u>, 195 F.3d at 211, and because Plaintiff has shown that its U.S. server was accessed and that Defendant knew that the server was located in the United States, Plaintiff has shown that Defendant's actions were intentionally aimed at the United States.

Plaintiff's claims arise out of or relate to Defendant's alleged unlawful access of Plaintiff's U.S. servers.  Without access to Plaintiff's servers Defendant would not have obtained confidential information and trade secrets in violation of the Defend Trade Secrets Act and the Computer Fraud and Abuse Act. Finally, for the reasons discussed in Section C(1)(b) above, the court concludes that exercising personal jurisdiction over Defendant under Rule 4(k)(2) is constitutionally reasonable.

### III.  <u>Motion to Dismiss for Lack of Subject Matter Jurisdiction and Improper Venue</u>

Defendant moves to dismiss under Rule 12(b)(1) arguing that the court lacks subject matter jurisdiction to resolve a dispute that is subject to mandatory arbitration and under Rule 12(b)(3) arguing that venue is improper.[38]

### A.  Agreement to Arbitrate

Defendant moves to dismiss for lack of subject matter jurisdiction because the Agreement requires that except for claims

---

[37]Horne Declaration, Exhibit A to Defendant's Reply, Docket Entry No. 31-1, p. 4 ¶ 8.

[38]Defendant's Motion to Dismiss, Docket Entry No. 18, pp. 9-10.

against Plaintiff, all disputes must be resolved by arbitration in London, England, and Plaintiff's claims against Defendant fall within the scope of the arbitration clause.[39] Plaintiff responds that the arbitration clause is not enforceable and that Plaintiff's claims fall outside the scope of the arbitration clause.[40] In its Reply Defendant argues that the Agreement contains an implied delegation clause, but that even if the court decides arbitrability, Plaintiff's claims fall within the arbitration clause.[41]

"Subject-matter jurisdiction properly comprehended refers to a tribunal's power to hear a case, and can never be forfeited or waived." Union Pacific Railroad Co. v. Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment, Central Region, 130 S. Ct. 584, 589 (2009) (citations and quotations omitted). Because "mandatory grievance and arbitration procedures in contracts . . . are waivable [they] do not affect this court's subject-matter jurisdiction." Ruiz v. Donahoe, 784 F.3d 247, 249 (5th Cir. 2015). "[A]greements to arbitrate implicate forum selection and claims-processing rules[,] not subject matter jurisdiction." Id. at 250. The court has subject matter jurisdiction over Plaintiff's claims under the Defend Trade Secrets

---

[39]Id. at 10.

[40]Plaintiff's Response, Docket Entry No. 25, pp. 24-25.

[41]Defendant's Reply, Docket Entry No. 31, pp. 20-23.

Act and the Computer Fraud and Abuse Act because those claims arise under the laws of the United States.

## 1. Applicable Law

Under the Federal Arbitration Act ("FAA") an arbitration clause in a contract evidencing a transaction involving interstate commerce is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.[42] Underlying the FAA is "the fundamental principle that arbitration is a matter of contract." AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1745 (2011) (internal quotation marks omitted); see Washington Mutual Finance Group, LLC v. Bailey, 364 F.3d 260, 264 (5th Cir. 2004) ("The purpose of the FAA is to give arbitration agreements the same force and effect as other contracts -- no more and no less.").

In determining whether to enforce an arbitration clause "[f]irst, the court asks whether there is a valid agreement to arbitrate and, second, whether the current dispute falls within the scope of a valid agreement." Edwards v. Doordash, Inc., 888 F.3d 738, 743 (5th Cir. 2018) (citing Klein v. Nabors Drilling USA L.P.,

_____

[42]The parties do not dispute that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("The Convention Act") governs this case. See Defendant's Reply, Docket Entry No. 31, p. 19. But "the FAA applies to the extent that it is not in conflict with the Convention Act." Freudensprung v. Offshore Technical Services, Inc., 379 F.3d 327, 341 (5th Cir. 2004) (citations and quotations omitted). The parties do not argue that a conflict exists between the FAA and The Convention Act.

710 F.3d 234, 236 (5th Cir. 2013)). "Whether [the parties] entered a valid arbitration contract turns on state contract law." Kubala v. Supreme Production Services, Incorporated, 830 F.3d 199, 202 (5th Cir. 2016). If the parties have entered into a binding agreement to arbitrate, the court must determine whether any federal statute or policy renders the claims nonarbitrable. JP Morgan Chase & Co. v. Conegie ex rel. Lee, 492 F.3d 596, 598 (5th Cir. 2007). If the party seeking arbitration argues that there is a delegation clause -- a written agreement referring disputes about arbitrability to an arbitrator -- the court performs the first step of the analysis to determine if an agreement to arbitrate was formed, then determines if it contains a valid delegation clause.[43] Edwards, 888 F.3d at 743-44.

> [W]e first look to see if an agreement to arbitrate was formed, then determine if it contains a delegation clause. If there is an agreement to arbitrate with a delegation clause, and absent a challenge to the delegation clause itself, we will consider that clause to be valid and compel arbitration. Challenges to the arbitration agreement as a whole are to be heard by the arbitrator. Arguments that an agreement to arbitrate was never formed, though, are to be heard by the court even where a delegation clause exists. See Kubala, 830 F.3d at 202. Since Kubala, we have reiterated that the first step of the test is limited to contract formation.

Id. at 744. The party seeking to invalidate an agreement to arbitrate bears the burden of establishing its invalidity. Carter

---

[43]In his Reply Defendant argues that the Agreement contains an implied delegation clause because it incorporates English law. See Defendant's Reply, Docket Entry No. 31, p. 20.

v. Countrywide Credit Industries, Inc., 362 F.3d 294, 297 (5th Cir. 2004).    A   court   should   resolve   all   doubts   concerning   the arbitrability of claims in favor of arbitration.    Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 105 S. Ct. 3346, 3353-54 (1985).

2.    Whether There is an Agreement to Arbitrate

The Arbitration and Dispute Resolution clause ("Arbitration Clause") in Section 12 of the Agreement states:

> A.    Except  for  any  claims  against  FTF,  **all
> disputes,  controversies  or  claims  arising  out  of  or
> relating to this Agreement (including for any breach,
> invalidity or interpretation of this Agreement), any non-
> contractual obligations arising out of or in connection
> with this Agreement, the relationship between Horne and
> the Company, services performed for or on behalf of the
> Company,  shall  be  finally  adjudicated  by  arbitration
> under  the  London  Court  of  International  Arbitration
> ("LCIA") Rules** in force at the date of this Agreement,
> which are deemed to be incorporated by reference into
> this section 12A, subject to other provisions of this
> section 12A. . . . **[T]he arbitration agreement in this
> section 12A is governed by English law**. . . .

> B.    All disputes, controversies or claims arising
> out of or relating to this Agreement (including for any
> breach, invalidity or interpretation of this Agreement as
> to FTF), and any non-contractual obligations arising out
> of or in connection with this Agreement against FTF shall
> be  finally  adjudicated  by  arbitration  before  JAMS,
> Inc. . . .

> . . .

> D.    If  the  provisions  for  arbitration  in  this
> Agreement  are  for  any  reason  invalidated  or  deemed
> unenforceable  the  parties  agree  to  submit  to  the
> exclusive jurisdiction and venue of the federal courts
> located in Houston, Texas, USA, for any legal suit,

action or proceeding arising out of or based upon this Agreement, the breach of this Agreement, or any other aspect of the parties' relationship, including claims against the Company or FTF and/or their or against their affiliates. . . .[44]

The Choice of Law: Jurisdiction and Venue clause ("Forum-Selection Clause") in Section 14 of the Agreement states:

14. <u>Choice of Law: Jurisdiction and Venue</u>. Except as to claims against FTF, this Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formulation (including non-contractual disputes or claims) shall be governed and construed in accordance with the laws of England and Wales. **Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims), except as to claims against FTF.** As to claims against FTF, any dispute, controversy, or proceeding arising out of or related to this Agreement shall be brought solely and exclusively in Houston, Texas, United States of America.[45]

The Agreement contains a survival clause stating that Sections 12 and 14 will survive termination of the Agreement, and a severability clause stating that any unenforceable provisions will not invalidate the remainder of the Agreement.[46]

Defendant argues that under Section 14 of the Agreement "the courts of England and Wales [] have exclusive jurisdiction to resolve any issue related to contract formation except as to claims

_____

[44]Agreement, Exhibit A to Complaint, Docket Entry No. 1-2, pp. 10-11 ¶ 12 (emphasis added).

[45]<u>Id.</u> at 11-12 ¶ 14 (emphasis added).

[46]<u>Id.</u> at 11-12 ¶¶ 13, 15.

against Fintech (FTF)."[47]  Plaintiff responds that Sections 12(A) and 14 are irreconcilably inconsistent and therefore the parties did not have a meeting of the minds as to how disputes against Defendant would be adjudicated.[48]

"[T]he question whether an arbitration provision conflicts with other dispute resolution provisions is properly analyzed under the 'validity' step of the arbitration analysis." Sharpe v. AmeriPlan Corp., 769 F.3d 909, 915 (5th Cir. 2014) (citation omitted).  "State law . . . thus controls that question and the Federal Arbitration Act's presumption in favor of arbitration is not implicated." Id.  The parties do not dispute that Texas law governs this issue.  Under Texas law when interpreting a contract the court "examine[s] the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless." MCI Telecommunications Corp. v. Texas Utilities Electric Co., 995 S.W.2d 647, 652 (Tex. 1999).  "[A]n ambiguous or inconsistent provision of a contract should be construed strictly against the party that drafted it." Bexar County Hospital District v. Factory Mutual Insurance Co., 475 F.3d 274, 277 (5th Cir. 2007) (citing Gonzalez v. Mission American Insurance Co., 795 S.W.2d 734, 737 (Tex. 1990)).

In Sharpe the Fifth Circuit analyzed whether the language in a previously-signed Sales Director Agreement could be reconciled

---

[47]Defendant's Motion to Dismiss, Docket Entry No. 18, p. 8.

[48]Plaintiff's Response, Docket Entry No. 25, p. 25.

with the arbitration clause in a revised Policy Manual (which did not supersede the previous agreement).  Sharpe, 769 F.3d at 912. The Sales Director Agreement stated that "'[t]his agreement is to be governed by and construed in accordance with the laws of the State of Texas.  Any action brought on matters relating to this Agreement shall be maintained in Dallas, Dallas County, Texas.'" Id. at 913.  The Policy Manual stated that "[a]ny issue, dispute, claim or controversy . . . between AmeriPlan or any officer, director, employee, . . . of AmeriPlan and IBO/Sales Director, arising out of or relating to the . . . Sales Director Agreements . . ., shall be resolved by binding arbitration at the AmeriPlan headquarters in Plano, Texas.  The Claim shall be governed by the laws of the State of Texas."  Id.  The Fifth Circuit held that there was no inherent conflict "because lawsuits often precede arbitration (when a court may be asked to decide the validity, scope, and enforceability of an arbitration clause) or follow arbitration (when a court may be asked to enforce or set aside an arbitration award)."  Id. at 916.  "A forum selection clause thus still has effect in determining where any lawsuit -- even one that may result in an order compelling arbitration -- must be brought." Id.

The clauses at issue are similar to those in Sharpe and both may be given effect.  Pursuant to Section 12 of the Agreement, Plaintiff may submit its claims against Defendant to arbitration in

London, England. Pursuant to Section 14, the courts of England and Wales are the proper forum to resolve disputes regarding arbitrability and to decide any claims against Defendant that are determined not to be arbitrable. <u>See</u> <u>Sharpe</u>, 769 F.3d at 916; <u>Personal Security & Safety Systems Inc. v. Motorola Inc.</u>, 297 F.3d 388, 396 (5th Cir. 2002).

## B.    Venue

Defendant argues that Plaintiff has not met its burden of proving that venue in this court is proper, and that the court should dismiss this action under Rule 12(b)(3) because of the Arbitration and Forum-Selection Clauses in the Agreement.[49] "Rule 12(b)(3) allow[s] dismissal only when venue is 'wrong' or 'improper.'  Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." <u>Atlantic Marine Construction Co., Inc. v. United States District Court for the Western District of Texas</u>, 134 S. Ct. 568, 577 (2013).  If venue is not proper under 28 U.S.C. § 1391, the case must be dismissed or transferred, but "a case filed in a district that falls within § 1391 may not be dismissed under . . . Rule 12(b)(3)." <u>Id.</u>  Because the court has concluded that it has

---

[49]Defendant's Motion to Dismiss, Docket Entry No. 18, p. 9.

personal jurisdiction over Defendant, venue in this court is proper under 28 U.S.C. § 1391(b)(3).[50]

"[A]rbitration agreements are a 'specialized kind of forum-selection clause.'" <u>Warren v. Federal National Mortgage Association</u>, ---- F. App'x. ---- 2018 WL 2077904, at *10 (5th Cir. May 3, 2018) (quoting <u>Scherk v. Alberto-Culver Co.</u>, 94 S. Ct. 2449, 2457 (1974)). "[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of <u>forum non conveniens</u>." <u>Atlantic Marine</u>, 134 S. Ct. at 580. Although Defendant did not move to dismiss on the basis of <u>forum non conveniens</u>, based on Defendant's argument that the Agreement mandates that the action be arbitrated under the aegis of the courts of England and Wales, the court will evaluate whether dismissal under <u>forum non conveniens</u> is appropriate.

---

[50]28 U.S.C. § 1391(b) states:

(b) **Venue in general.**--A civil action may be brought in--

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

1.  Applicable Law

"A federal court has discretion to dismiss a case on the ground of forum non conveniens when an alternative forum has jurisdiction to hear [the] case, and . . . trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." Sinochem International Co. Ltd. v. Malaysia International Shipping Corp., 127 S. Ct. 1184, 1190 (2007) (internal quotations and citations omitted). In considering forum non conveniens the court ordinarily must weigh the parties' private interests, the plaintiff's choice of forum, and various public-interest factors. Atlantic Marine, 134 S. Ct. at 581. A valid forum-selection clause simplifies the forum non conveniens doctrine because (1) the plaintiff's choice of forum is given no weight and (2) the private-interest factors weigh in favor of the preselected forum so that the court only considers public-interest factors. Barnett v. DynCorp International, L.L.C., 831 F.3d 296, 300 (5th Cir. 2016) (citing Atlantic Marine, 134 S. Ct. at 581-82). Therefore, "a 'valid' forum-selection clause pointing to a foreign tribunal requires forum non conveniens dismissal absent unusual circumstances." Id. at 301 (citing Atlantic Marine, 134 S. Ct. at 581-83 & n.8.).

Federal Law governs the enforceability of a forum-selection clause. Id. The law

> requires a party attacking a forum-selection clause to overcome a presumption of enforceability by showing that the clause is "'unreasonable' under the circumstances" because
>
> (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

Id. (quoting Haynsworth v. The Corporation, 121 F.3d 956, 963 (5th Cir. 1997)).


2.  Application

Because Plaintiff drafted the Agreement[51] it cannot argue that Sections 12 and 14 were incorporated by fraud or overreach, or that English law would unfairly deprive Plaintiff of a remedy. Plaintiff will not be deprived a day in court because if necessary it can seek to compel arbitration in the courts of England and Wales under Section 14 of the Agreement. Because the court has already concluded that Sections 12 and 14 of the Agreement can be

---

[51]See Horne Declaration, Exhibit A to Defendant's Reply, Docket Entry No. 31-1, p. 6 ¶ 15 ("I was presented with and was required to sign the agreement attached to Fintech's Complaint in this case. I was told no changes would be made to it and I signed it as drafted by CrossVerify and/or Fintech."). Nowhere in Plaintiff's Complaint, Response, or Surreply does it dispute that Plaintiff drafted the Agreement.

harmonized, the court concludes that the Forum-Selection Clause is enforceable. The court will therefore apply <u>Atlantic Marine</u>'s <u>forum non conveniens</u> framework. <u>See Atlantic Marine</u>, 134 S. Ct. 568, 583 n.8 (presuming that the forum-selection clause was valid and holding that the same standards apply to valid forum-selection clauses pointing to state or foreign forums). Because Plaintiff's choice of the court carries no weight and because the private-interest factors weigh in favor of the parties' preselected forum, the court will only consider public-interest factors. <u>See Atlantic Marine</u>, 134 S. Ct. at 582. Those factors include

> administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

<u>Barnett</u>, 831 F.3d at 309 (citations omitted). "These factors justify a refusal to enforce a forum-selection clause only in truly exceptional cases." <u>Id.</u> (internal quotations and citations omitted).

All of the public-interest factors weigh in favor of dismissal of this action. Defendant is a citizen of the UK, CrossVerify is a UK company, and the parties agreed that "the arbitration agreement in this Section 12A is governed by English law."[52] Should

---

[52]Agreement, Exhibit A to Complaint, Docket Entry No. 1-2, p. 10 ¶ 12.

it be necessary to compel arbitration, the courts of England and Wales have an interest in deciding the controversy. England is not an unrelated forum because relevant parties and witnesses are citizens of the UK.

## IV. Conclusions and Order

For the reasons explained above, the court concludes that Plaintiff has met its burden of establishing facts capable of supporting the court's exercise of personal jurisdiction over Defendant Horne, but that pursuant to the parties' Agreement, this is not the proper court to compel arbitration. Accordingly, Defendant Ralph Horne's 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction and Subject Thereto, 12(b)(1) and 12(b)(3) Motion to Dismiss for Lack of Subject Matter Jurisdiction and Improper Venue (Docket Entry No. 18) is **GRANTED**, and this action will be dismissed without prejudice.

**SIGNED** at Houston, Texas, on this the 6th day of July, 2018.

SIM LAKE
UNITED STATES DISTRICT JUDGE